Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
Andrew J. Somers, #19078
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com
andrew@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| HAL G. and I.G., <br><br> Plaintiffs, <br><br> vs. <br><br> BLUE CROSS BLUE SHIELD HEALTHCARE PLAN of GEORGIA INC. d/b/a ANTHEM BLUE CROSS and BLUE SHIELD, and the BANK of AMERICA GROUP BENEFITS PROGRAM, <br><br> Defendants. | COMPLAINT |

Plaintiffs Hal G. ("Hal") and I.G., through their undersigned counsel, complain and allege against Defendants Blue Cross Blue Shield Healthcare Plan of Georgia Inc. d/b/a Anthem Blue Cross and Blue Shield ("Anthem"), and the Bank of America Group Benefits Program ("the Plan") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. Hal and I.G. are natural persons residing in St Johns County, Florida. Hal is I.G.'s father.

2. Anthem is an independent licensee of the nationwide Blue Cross and Blue Shield network of providers and acted as a third-party claim administrator, as well as the fiduciary under ERISA for the Plan during the treatment at issue in this case.

3. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). Hal was a participant in the Plan and I.G. was a beneficiary of the Plan at all relevant times. Hal and I.G. continue to be participants and beneficiaries of the Plan.

4. Plan participants and beneficiaries were told that Anthem was the entity to which they were to submit claims, request documents and other information, and otherwise communicate about their benefits under the Plan.

5. At all relevant times, Anthem acted as the agent for both the Plan and the Plan Administrator for processing claims, communicating with Plan participants and beneficiaries about the status of their claims, and providing relevant documents, records, and other information as ERISA's claims procedure regulations define those terms.

6. The Plan Administrator is the designated administrator for the Plan.

7. I.G. received medical care and treatment at New Haven Residential Treatment Center ("New Haven") from May 3, 2024, to August 18, 2025. New Haven is a treatment facility located in Utah County, Utah, which provides sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

8. Anthem denied claims for payment of I.G.'s medical expenses in connection with her treatment at New Haven.

9. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

10. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because Anthem does business in Utah through its network of affiliates, as does the Plan Administrator, and the treatment at issue took place in Utah.

11. In addition, the Plaintiffs have been informed and reasonably believes that litigating the case outside of Utah will likely lead to substantially increased litigation costs he will be responsible to pay and that would not be incurred if venue of the case remains in Utah. Finally, given the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely both his and I.G.'s privacy will be preserved.

12. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### I.G.'s Developmental History and Medical Background

13. I.G. was born to an impoverished mother in Guatemala. Before I.G. turned two years old, she was cared for by four different foster mothers. Little is known about I.G.'s life during this period, but Hal was told that one of the foster mothers was "bad" with no further explanation of what that meant. I.G. was then adopted by Hal.

14. I.G. had a very cautious demeanor and tended to stay very close to her mother. Unbeknownst to Hal, I.G. and a neighbor boy engaged in inappropriate sexual contact starting around the time I.G. was in the first grade.

15. I.G. had difficulty making and keeping friends and often gravitated towards other children who had trouble fitting in. In the fifth grade, I.G.'s best friend suddenly told her that she no longer wanted to be friends. This was very difficult for I.G.

16. I.G. began spending more time online and was exposed to pornographic content. She unknowingly started speaking to sexual predators online who pretended to be boys her age. Parental controls were instituted, but I.G. was often able to bypass them.

17. I.G. increasingly isolated herself, which became even worse with the outbreak of the Covid-19 pandemic. Hal took away I.G.'s phone to lessen her technology dependence and she began attending outpatient therapy.

18. I.G. was discovered to be self-harming by cutting which became more intense as time went on. I.G. stopped studying, isolated herself even more often, slept most of the day and had very low moods. I.G. reported suicidal ideation, and on one occasion during school she called her mother and reported severe suicidal feelings resulting in a multi-day hospitalization.

19. I.G. was prescribed new medications and continued in therapy. Around this time, it was discovered that I.G. not only continued to communicate with adult men online but had met up with some of them. One of these men was thirty-five years old. The police conducted a sting operation and arrested him. The police told Hal that this man was likely grooming I.G. for sex trafficking.

20. I.G. then began attending a program called True North Wilderness Therapy in February of 2025, unfortunately this did little to resolve I.G.'s issues and she continued to engage in acts of self-harm and got into physical altercations with others at the program.

21. I.G.'s treatment team recommended that following her discharge from True North, she be admitted to a longer-term residential treatment program and she was admitted to New Haven.

### New Haven

22. I.G. was admitted to New Haven on May 3, 2024.

23. In a letter dated October 25, 2024, Anthem denied payment for I.G.'s treatment. The letter stated that treatment had been denied as:

> The request tells us you went to a residential treatment center for your mental health condition. The program asked to extend your stay. The plan clinical criteria considers [sic] ongoing residential treatment medically necessary for those who are a danger to themselves or others (as shown by hearing voices telling them to harm themselves or others or persistent thoughts of harm that cannot be managed at a lower level of care). This service can also be medically necessary for those who have a mental health condition that is causing serious problems with functioning. (For example, being impulsive or abusive, very poor self care, not sleeping or eating, avoidance of personal interactions, or unable to perform usual obligations). In addition, the person must be willing to stay and participate, and is expected to either improve with this care, or to keep from getting worse. The information we have does not show you are a danger to yourself or others, or that you are having serious problems functioning or your condition is likely to further improve with this care or get worse without it. For this reason, the request is denied as not medically necessary. There may be other treatment options to help you, such as outpatient services. You may want to discuss these with your doctor. It may help your doctor to know we reviewed the request using the MCG guideline Residential Behavioral Health Level of Care, Child or Adolescent (ORG: B-902-RES).

24. New Haven appealed this denial decision telephonically.

25. In a letter dated November 7, 2024, Anthem upheld the denial of payment for I.G.'s treatment. The letter stated in pertinent part:

> We reviewed all the information that was given to us before with the first request for coverage. We also reviewed all that was given to us for the appeal. Your doctor wanted you to stay longer in residential treatment care. You were getting this because you had been at risk for serious harm without 24-hour care. We understand that you would like us to change our first decision. Now we have new information from the medical record. We still do not think this is medically necessary for you. We believe our first decision is correct for the following reason: after the treatment you had, you were no longer at risk for serious harm that needed 24-hour care. You could have been treated with outpatient services. We based this decision on the MCG guideline Residential Behavioral Health Level of Care, Child or Adolescent (ORG: B-902-RES).
>
> Based on our administrative services only contract with your employer, we have been given discretionary authority to determine whether services are covered under the terms of your employer's Employee Health Benefits Plan, Bank of America Corporation. Per the Benefit Plan Design for your group, which your employer has approved, the residential treatment center level of care for dates of service October 22, 2024-onward, from New Haven LLC is not medically necessary and therefore not a covered service. Hence, no benefit is payable under the Plan for such service.

26. On October 15, 2025, Hal submitted a post-service appeal review letter to Anthem. Hal wrote that he was entitled to certain protections under ERISA during the appeal process, including a full, fair, and thorough review conducted by appropriately qualified reviewers whose identities were clearly disclosed, which took into account all of the information he provided, and which gave him the specific reasons for the adverse determination, referenced the specific plan provisions on which the denial was based, and which gave him the information necessary to perfect the claim.

27. Hal wrote that because Anthem had made its decision to uphold the denial of payment based on an expedited telephonic appeal, its reviewer did not have access to I.G.'s full medical records. He wrote that he was entitled to supplement the record with this evidence which Anthem had not yet considered.

28. He also contended that Anthem's denial should not apply for any dates of service that it evaluated without full access to I.G.'s medical records.

29. He wrote that the absence of medical records was particularly concerning to him, as Anthem's reviewer had not cited to a single piece of clinical evidence to support their decision and had instead simply issued a series of conclusory statements. He asked the next reviewer to make specific references to I.G.'s medical records to support their decision.

30. He voiced his concern that many insurers used artificial intelligence and automated systems as a cost saving measure. He asked for a copy of Anthem's internal case notes or reports to ensure that he had been given an adequate review by a human reviewer.

31. He asked Anthem's reviewer to have experience treating individuals with I.G.'s diagnoses and that they be trained in the details of MHPAEA in order to respond to his allegations concerning a violation of the statute.

32. Hal asked to be provided with a copy of the guidelines Anthem used. He stated that he was able to procure a copy of the MCG guidelines which it claimed to have used but was unable to which specific aspects of the criteria were supposedly not met. He asked the next reviewer to identify the exact provisions of these criteria which they alleged were met or not met.

33. He contended that the MCG criteria themselves, and particularly Anthem's application of them, violated generally accepted standards of medical practice. He asserted that other criteria, such as the CALOCUS-CASII criteria were more appropriate and less problematic.

34. He cited to a variety of court cases to bolster his argument, and contended for instance, that the MCG criteria overly relied on factors such as acuity and imminent danger and

were guidelines for children and adolescents in name only, without truly considering the needs of this group.

35. Hal stated that Anthem had an obligation under ERISA to act in accordance with his best interests. He pointed out that Anthem was relying on factors such as "risk for serious harm" which he alleged was not only an inappropriate metric to use to evaluate the medical necessity of residential treatment care but was also contrary to generally accepted standards of medical practice.

36. Hal expressed concern that the denial of payment for I.G.'s treatment was a violation of MHPAEA. He wrote that MHPAEA compelled insurers to ensure that benefits for mental health services were offered at parity with benefits for analogous medical or surgical services in the same classification.

37. Hal identified skilled nursing facilities, subacute rehabilitation facilities, and inpatient hospice services as some of the medical or surgical analogues to the treatment I.G. received.

38. Hal wrote that it appeared that Anthem was utilizing acute level requirements to evaluate the medical necessity of the non-acute care I.G. received. He wrote that he had reviewed the criteria for analogous medical or surgical services and could not find examples of Anthem requiring acute level symptoms for these medical or surgical analogues.

39. He asked Anthem to perform a MHPAEA compliance analysis on the Plan to ensure it was being administered in accordance with the statute and asked to be provided with physical copies of any documentation used in this analysis.

40. Hal argued that I.G.'s treatment at True North was medically necessary. He pointed out that she had attempted to elope from the program on multiple occasions, continued to

struggle with desires to self-harm, and had other persistent issues such as anxiety and intrusive thoughts.

41. He wrote that it wasn't until May of 2025 that I.G. started to see noticeable improvement, and she wasn't deemed ready for discharge until a few months later in August of 2025.

42. He included a letter of medical necessity dated October 10, 2025, from Amy Adkins, LSCW which stated in part:

> I am writing to document that [I.G.]'s admission to New Haven Residential Treatment Center was medically necessary based on the severity of her psychiatric symptoms, trauma history, and safety concerns at the time of intake.
>
> Prior to residential treatment, [I.G.] exhibited persistent major depression with recurrent suicidal ideation and chronic self-harming behaviors, which significantly compromised her safety. These behaviors reflected her limited impulse control, impaired judgment, and inability to ensure her own safety in a less-structured environment. Lower levels of care were unable to ameliorate these symptoms.
>
> Before admission, [I.G.] was sexually assaulted by a 35-year-old man she met in an online chat room, and she also engaged in inappropriate online sexual interactions with other older men. These incidents highlighted her extreme vulnerability, impaired boundaries, and difficulty assessing risk, particularly in digital and relational contexts.
>
> Clinically, [I.G.] presented with severe attachment disturbances rooted in her early adoption and compounded by multiple relational traumas. She demonstrated an avoidant attachment style, characterized by emotional distancing, distrust of caregivers, and difficulty expressing vulnerability, which significantly impacted her ability to connect, seek help appropriately, or tolerate closeness in relationships. Her avoidant personality features, coupled with generalized anxiety and severe depression, made it impossible for her to stabilize or progress in outpatient or community-based settings.
>
> At the time of admission, she required a structured, trauma-informed, and attachment-focused residential environment to maintain safety and begin meaningful therapeutic work. The 24-hour supervision, consistent therapeutic containment, and integrated treatment milieu at New Haven allowed for the intensive clinical interventions she needed, such as individual trauma therapy, family therapy, DBT skills, and attachment repair work, that were not possible in lower levels of care.

> Her placement in residential treatment was therefore clinically and medically necessary to:
>
>> 1. Ensure her physical and emotional safety given her ongoing suicidal ideation, self-harm, and elopement risk.
>> 2. Address the trauma and attachment injuries underlying her avoidant behaviors.
>> 3. Provide a stable therapeutic environment following sexual exploitation and retraumatization.
>> 4. Interrupt unsafe online sexual behaviors and reestablish healthy relational boundaries.
>> 5. Stabilize depressive and anxiety symptoms that severely impaired her daily functioning.
>
> Without the intensity and safety of a residential program, [I.G.] would have remained at high risk for self-harm, further exploitation, and emotional deterioration. The treatment provided at New Haven was essential in stabilizing her mental health, increasing her insight, and equipping her with the emotional regulation and relational skills necessary for long-term safety and recovery.
>
> It is my professional opinion that residential treatment was medically necessary, appropriate, and life-preserving for [I.G.] given her presentation at the time of admission.

43. Hal included an excerpt from a psychological assessment I.G. received at New Haven as well as copies of I.G.'s medical records with the appeal. These records documented issues such as ongoing suicidal ideation, inappropriate peer relationships, acts and desires to self-harm (including an incident involving an X-ACTO knife which required stitches and another incident with broken glass also requiring stitches), relapses, self-isolation, feelings of helplessness, food restriction, purging, and attempts to run away from treatment.

44. Hal wrote that while Anthem claimed it had relied on the MCG criteria to find that I.G.'s treatment was not medically necessary, I.G. did not meet the discharge requirements in these same criteria until her actual date of discharge on August 18, 2025.

45. Hal wrote that I.G.'s residential care was not only necessary but had also been effective and that it not only kept her safe but provided her with the best springboard for success in the future. He wrote that he would not have undertaken the financial and emotional strain of enrolling I.G. in residential care if he had any other option.

46. In addition Hal asked to be provided with a copy of all documents under which the Plan was operated, including all governing plan documents, the summary plan description, any insurance policies in place for the benefits he was seeking, any administrative service agreements that existed, any clinical guidelines or medical necessity criteria utilized in the determination (along with their medical or surgical equivalents, whether or not these were used), together with any reports or opinions regarding the claim from any physician or other professional, along with their names, qualifications, and denial rates (collectively the "Plan Documents").

47. Anthem acknowledged receipt of this letter, but Hal has not received any further response.

48. Hal brings this action now out of an abundance of caution to minimize the possibility of the action being untimely or past any applicable statutes of limitations, and because Anthem's conduct up to this point does not suggest it will reverse the denial of payment.

49. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

50. The denial of benefits for I.G.'s treatment was a breach of contract and caused Hal to incur medical expenses that should have been paid by the Plan in an amount totaling over $460,000.

//

# FIRST CAUSE OF ACTION

## (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

51. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as Anthem, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

52. Anthem and the Plan failed to provide coverage for I.G.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

53. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

54. The denial letters produced by Anthem do little to elucidate whether Anthem conducted a meaningful analysis of the Plaintiffs' appeals or whether it provided them with the "full and fair review" to which they are entitled.

55. For instance, Anthem asserted that I.G. was not at risk of serious harm outside of 24-hour care, when the treatment record contains multiple examples of I.G. engaging in behaviors such as purging, running away, and self-harming multiple times to the extent that sutures are required.

56. Anthem and the agents of the Plan breached their fiduciary duties to I.G. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act

solely in I.G.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of I.G.'s claims.

57. The actions of Anthem and the Plan in failing to provide coverage for I.G.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

58. While the presentation of alternative or potentially inconsistent claims in the manner that Plaintiffs state in their first and second causes of action is specifically anticipated and allowed under F.R.Civ.P. 8, Plaintiffs contend they are entitled to relief and appropriate remedies under each cause of action.

## SECOND CAUSE OF ACTION

**(Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))**

59. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of Anthem's fiduciary duties.

60. MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

61. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

62. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

63. The application of the medical necessity criteria used by Anthem for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the application of the medical necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

64. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for I.G.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

65. When Anthem and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice.

66. Anthem and the Plan evaluated I.G.'s mental health claims employing medical necessity criteria in a manner that deviates from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

67. As an example of disparate application of medical necessity criteria between medical/surgical and mental health treatment, Anthem's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that I.G. received. Anthem's improper use of acute inpatient medical necessity criteria is revealed in the statements in Anthem's denial letters such as a "danger to themselves or others (as shown by hearing voices telling them to harm themselves or others or persistent thoughts of harm that cannot be managed at a lower level of care)."

68. This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the sub-acute level of care that I.G. received.

69. The Plan does not require individuals receiving treatment at subacute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria to receive Plan benefits.

70. Anthem also states that care could be necessary if other serious functional impairments are present such as not sleeping or eating. I.G.'s treatment shows instances of concerning behaviors like food restricting and purging, but Anthem's reviewers made no mention of these.

71. Consequently, even in the event Anthem's use of acute level requirements are found not to violate MHPAEA as written, Plaintiffs allege that in application, Anthem imposed a more rigorous standard for mental healthcare than it does for analogous medical or surgical services.

72. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and Anthem, as written or

in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

73. The violations of MHPAEA by Anthem and the Plan are breaches of fiduciary duty and give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

    (a) A declaration that the actions of the Defendants violate MHPAEA;

    (b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

    (c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

    (d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

    (e) An order requiring an accounting of the funds wrongly withheld, by each Defendant, from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;

    (f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

    (g) An order equitably estopping the Defendants from denying the Plaintiff's claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

(i) An order requiring the Defendants produce the self-compliance analysis upon request as required by MHPAEA.

74. The remedies the Plaintiffs seek under MHPAEA are not available under ERISA even if they are successful in obtaining remedies for wrongful denial of the Plan benefits.

75. For example, declaratory relief, reformation of the medical necessity criteria, or an order enjoining the Defendants' use of acute care criteria for medical necessity for sub-acute inpatient treatment are not available as remedies for a wrongful denial of plan benefits.

76. Similarly, an order stating that the Defendants violated MHPAEA by applying acute care criteria to treatment provided in a sub-acute treatment setting is not available as a remedy for wrongful denial of Plan benefits.

77. In short, remedies for the Defendants' violations of MHPAEA may only be provided by appropriate equitable relief under 29 U.S.C. § 1132(a)(3) rather than 29 U.S.C. § 1132(a)(1)(B).

78. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. § 1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the total amount that is owed for I.G.'s medically necessary treatment at New Haven under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. § 1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3. Attorney fees and costs incurred pursuant to 29 U.S.C. § 1132(g); and

4. For such further relief as the Court deems just and proper.

DATED this 7th day of November, 2025.

By    s/ Brian S. King
       Brian S. King
       Attorney for Plaintiffs

County of Plaintiffs' Residence:
St Johns County, Florida